# SUPREME COURT—IN ADMIRALTY.

### W. E. HALIDAY *vs.* WILLIAM STOTT.

THE liability of the master of a vessel for the debts of passengers, departing this Kingdom without passports, attaches when he has conveyed them across the exterior line of the exclusive jurisdiction on to the high seas.

If a person be taken on board, beyond such boundary, with the preconcert and complicity of the master, or any one under his command, said collusive acts being prior to passing the limit of exclusive jurisdiction, such conveying away of the debtor would be a violation of the law, Sec. 651, Civil Code.

A thorough and faithful search of the vessel previous to passing the boundaries of our jurisdiction, with a view to guard against persons making their escape : *Held,* to be a compliance with the law.

ALLEN, C. J.

This is an action for the recovery of certain liabilities alleged to be incurred by the defendant for conveying on board the bark "Comet," of which he was master, Michael Morton Webster out of the Kingdom without a passport. The case is before the full Court on an appeal from the decision of the Chief Justice, the principles of which we approve, and, therefore, it will be unnecessary to re-examine, in detail, the legal positions taken by the defendant.

The Court will remark, however, that they have especially re-examined the argument, that was pressed with so much zeal and ability before us, that the proof must be conclusive that the defendant had knowledge of Webster being a passenger on board the "Comet." We should regard this construction as very easily defeating the force of the statute, without any complicity of the master. This provision may be likened to many cases under the revenue laws, where persons incur liability for acts in which they do not participate, and have no knowledge.

The Court regard a thorough and faithful search of the vessel, previous to passing the boundaries of our jurisdiction, without finding the passenger, or such other course as evinces a careful and thorough diligence in guarding against persons making their escape, as a compliance with the law.

It has been contended, very ingeniously, that although this

construction obtains, still the vessel was not out of the jurisdiction of this Kingdom, although she had passed the marine league over the sea adjoining its territories, and that if the passenger is discovered, as in this case, within four or five hundred miles of the port, or before he has passed into the jurisdiction of another Government, that it was the duty of the master to return and restore the debtor to the jurisdiction of his creditors. It is true that the Court has an admiralty jurisdiction, as contended, over the high seas, but the question before us to decide is, what is the true intent and meaning of the statute? The language is, that "every master or commanding officer of a vessel who shall convey out of the Kingdom any person not having a passport, shall be subject to a fine of fifty dollars, and be liable for all debts which such person may have left unpaid in this Kingdom." What is the meaning of the word "Kingdom" in this connection? Does it refer to the territory over which our laws exclusively prevail, including one marine league from the shore, or does it refer also to an admiralty jurisdiction on the high seas? Had the latter been the intention of the law, it should have been more explicit, for the usual and the legal meaning of the word "Kingdom" has no such extended application, and it would be doing violence to every principle of construction of a statute, penal in its character, to impart to it such an enlarged application. When the terms are used, "within the Kingdom of Great Britain," or "within the United States," jurisdiction is not claimed on the high seas. But it is contended with great ingenuity that the rights of the party are claimed on principles recognized by Admiralty Courts, which prevail over the high seas, and he seeks redress in a Court having admiralty jurisdiction. While this is true, the powers to be exercised in admiralty must be governed by law. It is true that it is a well settled principle of maritime law that owners are responsible in the admiralty for the torts of their masters, in acts relative to the service of the ship, and within the scope of their employment. This liability imposed by our statute was before unknown to the Admiralty. It is a new provision—a new prohibition—and, although we have regarded it as coming within admiralty jurisdiction, still it can only be exercised according to the meaning

and extent of the special provision. It is not a liability incurred for the violation of any general principle recognized in the Admiralty, or of any statute of the country under which the bark "Comet" sails. It is founded upon a statute of this Kingdom, and it can have no greater force or extent than its terms impose. The act complained of is committed in passing the boundary of the Kingdom on to the high seas; the Admiralty, therefore, assume rightfully a jurisdiction, and if there is a defense at the time and place, can the liability be incurred subseqently on the high seas? There is no provision of law against taking a man on board a vessel on the high seas and giving him a passage to any part of the world. If, however, there was evidence of collusion originating within the jurisdiction, and to be carried out beyond it to defeat the spirit and purpose of the statute, unquestionably the legal liability would be the same; but there is no provision against conveying a person found concealed on board a vessel, when on the high seas, to the port of destination. It is said that the offense is committed and the liability incurred when the knowledge is imparted to the master that a passenger is on board without a passport. This cannot be a legal position, if the view we have taken of the jurisdiction of the Kingdom be correct. If the vessel is out of the Kingdom and a passenger is taken on board and conveyed to its port of destination, it certainly can not be a violation of a law which is limited in its operation to the distance to which this Kingdom may lawfully extend its exclusive dominion over the sea adjoining its territories. It is unnecessary to discuss the question of liability for taking a person on board beyond the exterior line of our exclusive jurisdiction, under circumstances which would naturally excite suspicions that he was trying to make his escape from the Kingdom whose laws he had violated, or from persons with whom he had incurred liability. The decision must be made according to the facts and circumstances of each case. If they connected the act with the master of the vessel, or any one under his command, prior to passing the boundary of exclusive jurisdiction, it would be a violation of the law. In this case it is admitted that the defendant was entirely innocent of any collusion, and ignorant of Webster's being on board at the time the vessel passed the boundary.

W. E. Haliday *v.* William Stott.

The next and final ground of defense is, that the agents of the owners had made a thorough and faithful search of the vessel.   Capt. Wilcox testifies that Wilcox, Richards & Co. were the agents of the bark " Comet " in September last, and that he was one of that firm at that time, and that after the vessel hauled off from the wharf he went on board, and said to Mr. Lemont, the first officer, and Mr. Ragsdale, the purser, you must look and see whether there are any persons stowed away on board.   He said further, I will look into the cabin, and you may look forward into the steerage and forecastle ; the hatches were caulked down ; they went forward, and I went into the cabin and asked the steward if there were any strangers there. He replied that he did not know, whereupon I looked on one side while I went aft, and on the other side when I came back; I passed round the entire cabin, and the after cabin also.   There was no one stowed away in any of the berths.   I did not see Webster on board that day.   Lemont and Ragsdale brought to me one man who had stowed himself away, and they said they could find no more.   If Webster had been on deck, I should have seen him.   He could not have been stowed away aft without being seen.   The hatchways are usually closed in the morning, before the vessel sails, and then caulked down, as they were on this occasion.   If he had been in the hold he could not have got out without the hatches being taken off.   There are two hatchways on deck.   There is also a small hatchway in the cabin, under the table, and another forward leading into the forecastle.   I know the one in the cabin is caulked.   It is not used.   ·It has an oil-cloth over it.   The table is stationary.   I think there is another hatch leading into the run.   It is used for stores sometimes.   I did not move that hatchway or go down.   I would not like to stay there a great while, it is so close.   I did not think it was very likely that there would be anybody there.   The table and carpets and scuttle have to be moved to get down there.   It would be difficult to be stowed away there without some help.   Search is always made by myself or Mr. Richards.   After the search I left the vessel just off the esplanade, as she was sailing out.

It was admitted that Lemont and Ragsdale would, if present, testify that Mr. Wilcox ordered them to search the forecastle

and steerage while the said Wilcox searched the cabin, and that pursuant to said order the said bark was searched by the parties aforesaid, and that either Lemont or Ragsdale did find one man, who had stowed himself away in the forecastle, who presented his passport and paid his passage, and that no other person was found on board who did not belong to the ship's crew or had a passport, and that M. M. Webster was not found or seen by any one of the parties making the search on board the said bark until the bark was four or five hundred miles from the port of Honolulu.

At the suggestion of the counsel for the plaintiff, the defendant was sworn, and testified that on Monday night, as he thinks, after leaving Honolulu, although he is not positive as to the time, but is quite sure that the vessel was four or five hundred miles from that port, the mate notified him that Webster was on board, and when discovered was standing alongside the foremast. ·I told him to call Webster aft, and I said to him I was very sorry to see him in that state. I did not inquire where he was stowed away. I knew there was no passage way from the forecastle to the hold. I do not know whether there was any passage into the fore peak.

It is contended that reliance ought not to be placed on the evidence of Lemont and Ragsdale—that they are the very persons who would connive with passengers to get them out of the Kingdom, if they wished it. The same might be said of any one who should be directed to make the search. But this is not the proper mode to dispose of testimony which is unimpeached. When there is conflicting testimony, then the situation of the parties, and their liability to improper influences, is a proper matter of comment. But, as the evidence is given here, the danger of injury to the master and owners is so great, and the probable compensation which those persons would receive so small, that the Court cannot raise a presumption of false testimony on such premises.

It is further contended that search was not made by the master, or his order, and, therefore, not in conformity to law. The Court regard a search, instituted by the owners, as equally in compliance with the statute, as they are parties in interest. It is their duty as well as that of the master to prevent a vio-

lation of the law, and it would be an extraordinary provision which should impose a liability and yet interpose obstacles to prevent the party from incurring it. The owners being proper persons to make the search, they can impose this duty upon the agents of their ship, which was done in this case.

We see no reason to make the rule more rigid than was prescribed by the Chief Justice, and we are of opinion that the testimony brings the case within that rule, and therefore judgment will be entered for the defendant.

In view, however, of the circumstances of the case, the costs will be paid equally by the parties.

Mr. Montgomery and Mr. Harris for the plaintiff.

Mr. Bates for defendant.